Filed 11/17/23  Pullen v. Jacuzzi CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT PULLEN, as Successor in Interest, etc.<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JACUZZI, INC. et al.,<br><br>Defendants and Respondents. | D082254<br><br>(Super. Ct. No. CIVDS1935655) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Brian S. McCarville, Judge.  Reversed and remanded with directions.

Ferguson Case Orr Paterson, Wendy C. Lascher; Carpenter, Zucherman & Rowley and John A. Kawai for Plaintiff and Appellant.

Horvitz & Levy, Mitchell C. Tilner, Mark A. Kressel; Edlin Gallagher Huie & Blum, Erin K. Poppler, Micheal E. Gallagher, Joshua R. Edlin; Weinberg Wheeler Hudgins Dunn & Dial and Marjan Hajimirzaee for Defendant and Respondent Jacuzzi, Inc.

Schumann, Rosenberg & Arevalo, Eric Arevalo, David Philip Reid and Jeffrey P. Cunningham for Defendant and Respondent FirstStreet for Boomers and Beyond, Inc.

In this products liability action involving a walk-in bathtub, Robert Pullen (Robert) appeals from a judgment of dismissal of the claims he brought as a successor in interest to his deceased mother, Susan Pullen (Susan), following the trial court's orders sustaining demurrers filed by defendants Jacuzzi, Inc. (Jacuzzi) and FirstStreet for Boomers and Beyond, Inc. (FirstStreet).[1] Robert contends that the trial court erred in sustaining Jacuzzi's and FirstStreet's demurrers. He also challenges the trial court's ruling on motions to strike certain allegations from the second amended complaint (SAC).

We conclude that, as the trial court ruled, the demurrers were properly sustained because Robert's successor-in-interest claims, as currently pled, are barred by the statute of limitations. Further, the trial court did not err by granting the motions to strike. However, we conclude that, in ruling on the demurrers, the trial court abused its discretion because it did not give Robert leave to amend to allege that the statute of limitations was tolled because, as the subject of a guardianship order during the relevant timeframe, Susan lacked the legal capacity to make decisions within the meaning of Code of Civil Procedure section 352, subdivision (a).[2] Accordingly, we reverse the judgment of dismissal, and we remand for further proceedings consistent with this opinion.

---

[1] For the sake of clarity, we refer to the members of the Pullen family by their first names. We intend no disrespect in doing so.

[2] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

According to the allegations in the SAC, in December 2016, Robert had a Jacuzzi walk-in bathtub installed in Susan's home "to assist his infirm mother with bathing." In September 2017, Susan "was using the Jacuzzi walk-in tub, sitting on the tub seat when she slipped off the seat and became stuck in the bottom of the tub, sustaining injuries." Susan "never recovered, going from being rescued from the tub, to her bed, then the hospital, and finally to hospice care, where she eventually died on December 2, 2017." The incident in the bathtub (the Incident) was allegedly "a substantial contributing factor to [Susan's] death." Susan was 74 years old when she died.

On November 26, 2019, Robert filed a lawsuit against Jacuzzi (the bathtub's manufacturer) and FirstStreet (the bathtub's distributor).[3] Robert filed the lawsuit both on behalf of himself individually (the wrongful death

---

[3] Robert also sued the company that installed the bathtub, Atlas Home Improvement LLC, but he later dismissed that party with prejudice after it filed a motion to quash service of summons. Further, Robert named his sister Tracey Pullen as a nominal defendant based on the allegation that she had also inherited Susan's right to sue but had chosen not to participate in bringing the lawsuit. (See *Corder v. Corder* (2007) 41 Cal.4th 644, 652 [wrongful death actions brought under § 377.60 by a decedent's heirs "are deemed joint, single and indivisible and must be joined together in one suit"].)

claims)[4] and as the successor in interest to Susan (the survivor claims).[5] The complaint was filed less than two years after Susan's December 2017 death, but more than two years after the September 2017 Incident.

Against both Jacuzzi and FirstStreet, the complaint alleged (1) strict product liability, (2) negligence, (3) breach of express warranty, (4) breach of the implied warranty of fitness for a particular purpose, and (5) breach of the implied warranty of merchantability. The complaint also sought an award of punitive damages.

In describing the alleged product defects, the complaint alleged "the Jacuzzi walk-in bathtub is a death trap for nearly any elderly person who happens to fall down or have a medical episode inside the bathtub because there are no grab bars positioned in a way that someone can get back up if they fall down or brace themselves when they are unable to get up or out of the tub and thereby suffer a medical episode or even drown because the door opens inward and traps the elderly person inside the bathtub."

Jacuzzi demurred to the original complaint, challenging all of the causes of action that Robert brought as survivor claims on the ground that

---

4    "A cause of action for wrongful death is . . . a statutory claim. (§§ 377.60–377.62.)  Its purpose is to compensate specified persons—heirs— for the loss of companionship and for other losses suffered as a result of a decedent's death." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1263.)  "[A]s a usual matter, the date of accrual of a cause of action for wrongful death is the date of death." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 404 (*Norgart*).)

5    The "survival statutes," which authorize a "survivor claim," "prevent the abatement of the decedent's cause of action and provide for its enforcement by the decedent's personal representative or successor in interest." (*San Diego Gas & Electric Co. v. Superior Court* (2007) 146 Cal.App.4th 1545, 1553, citing §§ 377.20, 377.30.)

4

they were barred by the applicable two-year statute of limitations (Code Civ. Proc., §§ 335.1, 366.1). Jacuzzi also filed a motion to strike the allegations associated with the prayer for punitive damages on the ground that, if its demurrer was sustained, only the wrongful death claims would remain, for which a punitive damages award was not available. (See *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 796 (*Boeken*).)

In opposition, Robert argued that although the survivor claims were filed more than two years after the Incident, the statute of limitations did not bar them based on (1) "the discovery rule" (*Norgart, supra*, 21 Cal.4th at p. 397); (2) "[t]he doctrine of fraudulent concealment" (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 533 (*Regents*)); and (3) Susan's alleged lack of "capacity to make decisions from the date of the incident until she died" within the meaning of section 352, subdivision (a). The trial court sustained Jacuzzi's demurrer to the original complaint with leave to amend and granted the motion to strike.[6]

Robert filed a first amended complaint (FAC), which added certain allegations addressing the statute of limitations. Among other things, the FAC added the following allegation: "At the time that Decedent Susan Pullen suffered the incident in September 2017, and continuing for the rest of her life, [Susan] was schizophrenic and lacked the legal capacity to make decisions. She did not, and with reasonable diligence in her condition, could not, discover at any time after the incident that the Jacuzzi walk-in tub was dangerously or defectively designed or manufactured, and that the dangerous

---

[6]  FirstStreet also filed a demurrer to the original complaint and a motion to strike, which were taken off calendar because Robert was granted leave to file an amended complaint in response to Jacuzzi's demurrer.

or defective design or manufacturing, and unsuitability for its intended use of the walk-in tub was the cause of her injuries and/or death."

FirstStreet and Jacuzzi both demurred to the FAC. As before, Jacuzzi demurred only to Robert's survivor claims on the ground that they were barred by the statute of limitations. FirstStreet demurred on that ground, and others, directing its challenge both to the survivor claims and to the wrongful death claims. Both parties also filed motions to strike.

The trial court sustained (1) both parties' demurrers as to the survivor claims, with leave to amend, based on the statute of limitations bar; and (2) FirstStreet's demurrer as to the causes of action for breach of express warranty, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability (collectively, "the breach of warranty causes of action") as to both the survivor and wrongful death claims. The trial court also granted the motions to strike the allegations regarding punitive damages. In ruling on Jacuzzi's demurrer, the trial court stated that leave to amend would be limited to adding allegations to support Robert's contention that the statute of limitation was tolled due to Susan's legal incapacity from the time of the Incident to her death.[7] In

---

[7] Printouts of court dockets from the website of the Wayne County, Michigan probate court, which related to conservatorship and guardianship proceedings involving Susan, were the subject of a request for judicial notice that FirstStreet submitted to the trial court to support its demurrer to the FAC. FirstStreet submitted those documents to support its unsuccessful challenge to Robert's standing to bring the survivor claims. The trial court denied that request for judicial notice, as FirstStreet did not submit certified copies of the relevant court dockets. In requesting leave to amend in response to the demurrers to the FAC, counsel for Robert represented to the trial court that if granted leave to amend he would "get . . . documentation to the court" from the relevant Michigan court proceedings to show that the statute of limitations was tolled because Susan lacked capacity. Specifically,

6

ruling on FirstStreet's demurrer, the trial court stated that leave to amend was granted as to the punitive damages allegations and the breach of warranty causes of action.

Robert then filed the SAC. To address the statute of limitations bar, the SAC alleged that "[a]t the time of the incident, [Susan] lacked the legal capacity to make decisions resulting from a mental disability" and that Susan "was incapable [of] caring for her property or transacting business or understanding the nature or effects of her acts both prior to the incident in question and until her untimely death."

To support those allegations, the SAC set forth several paragraphs describing Susan's alleged mental disability. Specifically, it alleged (1) Susan was a "diagnosed paranoid schizophrenic, under the care of a psychiatrist, and was being medicated for that mental illness" prior to the Incident and until her death; (2) Susan was "involuntarily hospitalized for medical treatment" on a series of dates: May 2010, January 2011, and June 2016; (3) Robert "was granted conservatorship of [Susan's] affairs in 2011 by the state of Michigan"; and (4) Robert "lived with [Susan] and acted as her care taker" prior to the Incident and until her death. The SAC also described how Susan's mental illness "manifested" itself: (1) delusions of " 'voices' in her head"; (2) a belief that Robert was suffering from delusions, not her; (3) a belief that Robert was poisoning her when administering medication; (4) an inability to dress herself; (5) an abnormal sleeping schedule; (6) a refusal to bathe and address her hygiene; (7) a lack of social relationships except with her children; (8) refusal to leave the house except for medical care; and (9) obesity.

---

counsel stated he would allege "the fact [Susan] was incapacitated and she had a guardian." The trial court granted leave to amend for Robert to do so.

7

Apart from describing Susan's mental illness, the SAC also alleged that as a result of the injuries incurred during the Incident, Susan "was placed in her bed by the Emergency Medical Service [and] was hospitalized and placed in the ICU the next day," after which she eventually entered hospice care and died. The SAC alleged that, accordingly, Susan's "capacity to make decisions never reached a degree where caring for her property or transacting business or understanding the nature or effects of her acts would describe her reality."

Jacuzzi and FirstStreet filed demurrers to the SAC. Both parties contended that the survivor claims were barred by the statute of limitations, and that (as the trial court ruled as to the FAC) the breach of warranty causes of action failed to state a claim.[8] Jacuzzi and FirstStreet also filed motions to strike. Both parties sought an order striking the punitive damages allegations. Jacuzzi also sought an order striking the allegations added in the SAC that went beyond the trial court's limited grant of leave to amend.

In opposition to the demurrers, counsel for Robert submitted a declaration describing the history of Susan's involuntary medical treatment and a conservatorship and a guardianship over Susan that were ordered by a Michigan court. Specifically, the declaration attached court documents showing that involuntary medical treatment was ordered for Susan in 2010, 2011 and 2016; a petition for appointment of a conservator for Susan was

---

8    As to the statute of limitations, Jacuzzi argued for the first time that "the sham pleading doctrine" (*Smyth v. Berman* (2019) 31 Cal.App.5th 183, 195 (*Smyth*)) barred Robert from alleging lack of capacity, as the two previous versions of the complaint alleged that Susan was "a competent adult" at the time of her death, but the SAC now specifically alleged that, at the time of her death, Susan "was an incompetent adult" and lacked the legal capacity to make decisions.

8

granted in 2011; and a petition for appointment of a guardian was granted on July 25, 2016. Although the documents were attached to counsel's declaration, Robert did not request that the trial court take judicial notice of them. Regarding the documents attached to counsel's declaration, Robert stated in his memorandum of points and authorities that "they themselves are not dispositive of protection" from the statute of limitations based on lack of legal capacity, "but are part of the larger ecosystem of allegations contained in the SAC which when proven with evidence could sustain a decision that [Susan] was mentally incompetent to a degree that would place her in the protected class." Jacuzzi and FirstStreet filed objections to counsel's declaration and the attached documents.

The trial court sustained both of the demurrers to the SAC without leave to amend, ruling that all of the survivor claims were barred by the statute of limitations, and that the breach of warranty causes of action failed to state a claim as to both the survivor claims and the wrongful death claims. As part of its ruling, the trial court sustained the objections to the declaration of Robert's counsel and the attached exhibits. The court granted the motions to strike the allegations relating to punitive damages. It further granted Jacuzzi's motion to strike some of the other paragraphs in the SAC that went beyond the scope of Robert's leave to amend.

The trial court then entered a judgment of dismissal as to Robert's survivor claims, from which Robert appeals in his capacity as the successor in interest to Susan's survivor claims.[9]

## II.

## DISCUSSION

A.  *Legal Standards for Review of a Demurrer*

"Generally, an order sustaining a demurrer on statute of limitations grounds is subject to de novo review on appeal.  [Citation.]  The untimeliness of the lawsuit must clearly and affirmatively appear on the face of the complaint and matters judicially noticed before an appellate court will affirm an order sustaining the demurrer."  (*Cavey v. Tualla* (2021) 69 Cal.App.5th 310, 326.)  "The plaintiff bears the burden on appeal to show the trial court erred by sustaining a demurrer.  [Citation.]  'A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground.' "  (*SLPR, L.L.C. v. San Diego Unified Port District* (2020) 49 Cal.App.5th 284, 317 (*SLPR*).)  " ' "A demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred.  [Citation.]  In order for the bar . . . to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred." ' "  (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors*

_____

[9]  As a result of the judgment of dismissal, the remaining claims in this litigation are Robert's wrongful death claims for strict product liability and negligence, to which Jacuzzi and FirstStreet have filed answers.  The wrongful death claims are not yet the subject of a final judgment, and they accordingly are not before us in this appeal, which was filed by Robert solely in his capacity as Susan's successor in interest.

(2010) 48 Cal.4th 32, 42.) The allegations of the complaint must be construed liberally, "with a view to substantial justice between the parties." (§ 452.)

"We review a court's denial of leave to amend a complaint on sustaining a demurrer for abuse of discretion." (*SLPR, supra*, 49 Cal.App.5th at p. 317.) "This abuse of discretion is reviewable on appeal 'even in the absence of a request for leave to amend' [citation], and even if the plaintiff does not claim on appeal that the trial court abused its discretion in sustaining a demurrer without leave to amend." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971 (*Aubry*).) The question is whether "there is a reasonable possibility that the defect can be cured by amendment." (*Ibid.*) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

B.     *A Two-year Limitations Period Bars the Survivor Claims Unless Robert Can Specifically Plead Otherwise*

The parties do not dispute that a two-year limitations period is generally applicable to each of the survivor claims. (§§ 335.1, 366.1.)[10] "The statute of limitations usually commences when a cause of action 'accrues,' and it is generally said that 'an action accrues on the date of injury.' " (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931.) The face of the complaint shows that the injuries to Susan at issue in the survivor

_____

[10]     Specifically, section 335.1 provides for a two-year limitations period for "[a]n action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another." (§ 335.1.) Because Susan died during that two-year period, the limitations period is the "later of the following times: [¶]  (a) Six months after the person's death.  [¶]  (b) The limitations period that would have been applicable if the person had not died." (§ 366.1.) Here, two years from the September 2017 Incident is a longer period than six months after Susan's December 2, 2017 death. Accordingly, the two-year period applies.

11

claims were caused by the Incident, which the SAC alleges took place in "September 2017." This action was filed more than two years later, on November 26, 2019, which is outside of the applicable two-year limitations period.

Robert contends, however, that several grounds exist on which to either toll or delay the accrual of the two-year limitations period until December 2, 2017, when Susan died, which would mean that the action was timely filed on November 26, 2019.

Our Supreme Court has explained the "well-recognized proposition that if on the face of the complaint the action appears barred by the statute of limitations, plaintiff has an obligation to anticipate the defense and plead facts to negative the bar." (*Union Carbide Corp. v. Superior Court* (1984) 36 Cal.3d 15, 25 (*Union Carbide*).) "[P]laintiff must plead facts which show an excuse, tolling, or other basis for avoiding the statutory bar . . . ." (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1266 fn. 4.) Put another way, "the 'plaintiff must "plead around" the defense, by alleging *specific facts* that would avoid the apparent defense. Absent such allegations, the complaint is subject to demurrer for failure to state a cause of action . . . .' " (*Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 824, italics added (*Gentry*).)

Robert identifies three different theories on which the two-year limitations period for the survivor claims was either tolled or subject to delayed accrual until Susan's death: (1) the discovery rule (*Norgart, supra*, 21 Cal.4th at p. 397); (2) the doctrine of fraudulent concealment (*Regents, supra*, 20 Cal.4th at p. 533); and (3) Susan's alleged lack of legal capacity (§ 352, subd. (a).) We consider each in turn to determine whether the SAC

12

sufficiently pleads " 'specific facts' " to establish any of those theories. (*Gentry, supra*, 99 Cal.App.4th at p. 824.)

1.    *The Discovery Rule*

We first consider whether the SAC sufficiently pleads that the discovery rule tolls the limitations period.

The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  (*Norgart, supra*, 21 Cal.4th at p. 397.)  Under this rule, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110.)  " 'Wrong' " is not "used in any technical sense, but rather in accordance with its 'lay understanding.' " (*Norgart,* at pp. 397–398.)  A person has "reason to suspect" an injury was caused by wrongdoing "when [the person] has ' " ' "notice or information of circumstances to put a reasonable person on inquiry" ' " ' " (*Id.* at p. 398, italics omitted.)

Case law has developed specific pleading requirements regarding the discovery rule.  "In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.'  [Citation.]  In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' " (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 808 (*Fox*).)

The SAC's allegations concerning the discovery rule are as follows: "The nature of [Susan's] injuries and damages, and their relationship to the design of the walk-in tub, was not discovered, and through reasonable care and due diligence could not have been discovered, by [Robert], until a time less than two years before the filing of this Complaint." In his appellate briefing, Robert also attempts to shore up his allegations about the discovery rule by pointing to the allegations concerning Susan's lack of capacity. He relies on the allegation that because of Susan's alleged lack of capacity, she "could not with reasonable diligence in her condition discover at any time after the incident that the Jacuzzi walk-in tub was dangerously or defectively designed or manufactured" or "comprehend that such a defect . . . was the cause of her injuries and/or death."

These allegations fail to meet the heightened pleading standards that apply when a plaintiff attempts to rely on the discovery rule. The most obvious pleading defect is that the SAC does not even attempt, as required, to allege with particularity "the time and manner of discovery" of Susan's survivor claims against Jacuzzi and FirstStreet. (*Fox, supra*, 35 Cal.4th at p. 808.) Instead, the *time* of discovery is described only in very vague terms as "a time less than two years before the filing of this Complaint," and there is no allegation whatsoever about the *manner* of discovery. Further, the SAC insufficiently alleges "the inability to have made earlier discovery despite reasonable diligence." (*Ibid.*) Robert attempts to rely on Susan's alleged lack of capacity as satisfying the requirement to allege that she could not have made an earlier discovery of her causes of action. However, the relevant inquiry is not whether Susan *herself* could have earlier discovered the causes of action, but rather whether the circumstances were sufficient to put " ' " ' "a reasonable person on inquiry." ' " ' " (*Norgart, supra*, 21 Cal.4th at p. 398,

14

italics omitted.)  The SAC pleads no facts to establish that a reasonable person, using reasonable diligence, would have failed to discover the causes of action after the Incident.

We accordingly conclude that the SAC does not adequately plead the discovery rule as a basis for postponing the accrual of the survivor claims until a date after Susan's death.

2.    *Fraudulent Concealment*

"A close cousin of the discovery rule is the 'well accepted principle . . . of fraudulent concealment.'  [Citation.]  'It has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it.' " (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931.)  "In articulating the doctrine, the courts have had as their purpose to disarm a defendant who, by [the defendant's] own deception, has caused a claim to become stale and a plaintiff dilatory." (*Regents, supra*, 20 Cal.4th at p. 533.)

To adequately plead fraudulent concealment to overcome a statute of limitations bar, "the complaint must allege (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." (*Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 900 (*Community Cause*).)  Further, "it must be shown that in the exercise of reasonable diligence the facts could not have been discovered at an earlier date." (*Baker v. Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315, 321 (*Baker*).)

15

"[G]eneral pleading of the legal conclusion of fraud is insufficient; the facts constituting the fraud must be alleged." (*Community Cause*, at p. 901.)

To invoke the doctrine of fraudulent concealment, the SAC alleges that "Defendants are estopped from asserting a statute of limitations defense because all Defendants fraudulently concealed from [Susan] and [Robert] the nature of [Susan's] injury and the connection between [Susan's] death and all Defendants' tortious conduct." The SAC also alleges that "Jacuzzi and all Defendants actually concealed from consumers like [Robert] and [Susan], their own knowledge of the dangerous or defective design or manufacturing and unsuitability for its intended use as a walk-in tub, and affirmatively represented the opposite." (Capitalization omitted.) The SAC sets forth a series of specific instances in which Jacuzzi and FirstStreet allegedly became aware of safety problems with Jacuzzi walk-in bathtubs between 2008 and 2017.

These allegations are insufficient because they do nothing more than (1) set forth a conclusory allegation of fraudulent concealment; and (2) allege that Jacuzzi and FirstStreet were aware of safety problems with Jacuzzi walk-in bathtubs. The SAC does not allege, as required, "when the fraud was discovered" or "the circumstances under which [the fraud] was discovered." (*Community Cause, supra*, 124 Cal.App.3d at p. 900.) The SAC also does not allege facts to show that Susan "had no actual or presumptive knowledge of facts sufficient to put [her] on inquiry" (*ibid.*), or that "in the exercise of reasonable diligence the facts could not have been discovered at an earlier date." (*Baker, supra*, 39 Cal.App.3d at p. 321.) On the contrary, the alleged safety problems with the bathtub are, according to the SAC, its inward-opening door, its slippery surface and its inadequate grab bars. The SAC does not explain why Jacuzzi's and FirstStreet's concealment that they knew

16

about those alleged defects would prevent a reasonable person from discovering the defects after the Incident.

Accordingly, the SAC does not adequately plead fraudulent concealment as a basis to toll the statute of limitations for the survivor claims.

### 3. *Lack of Legal Capacity to Make Decisions*

Robert's attempt to avoid the two-year limitations bar due to Susan's alleged lack of legal capacity is based on section 352, subdivision (a). The section provides, "If a person entitled to bring an action . . . is, at the time the cause of action accrued either under the age of majority or lacking the legal capacity to make decisions, the time of the disability is not part of the time limited for the commencement of the action." (§ 352, subd. (a).) Until a change in statutory language in 2015 to change the "outdated" and "offensive" terminology used to describe mental health conditions and disabilities (Stats. 2014, ch. 144, § 4; Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1847 (2013-2014 Reg. Sess.) as amended Apr. 22, 2014), the statute referred to a person being "insane" at the time the cause of action accrued, rather than "lacking legal capacity to make decisions." (§ 352, former subd. (a).) As the statutory amendment was intended solely to update terminology, case law developed under the prior version of the statute to define the term "insane" in section 352 continues to be applicable, and we will accordingly rely on those authorities. (See *In re Mirapex Prods. Liab. Litig.* (8th Cir. 2019) 912 F.3d 1129, 1132, fn. 2.)

For purposes of section 352, subdivision (a), a person lacks legal capacity to make decisions if " 'incapable of caring for [that person's own] property or transacting business or understanding the nature or effects of [that person's own] acts.' " (*Alcott Rehabilitation Hospital v. Superior Court*

17

(2001) 93 Cal.App.4th 94, 101 (*Alcott*).)  The "basic question . . . is whether the [person] is sufficiently aware of the nature or effects of [the person's own] acts to be able to comprehend such business transactions as the hiring of an attorney and the instigation of a legal action.  If [the person] is so aware, then the statute will begin to run against [that person]." (*Hsu v. Mt. Zion Hospital* (1968) 259 Cal.App.2d 562, 575 (*Hsu*).)

Lack of legal capacity to make decisions may be caused by mental illness, but courts long ago observed that "a person who is adjudged mentally ill and in need of hospital treatment under the Welfare and Institutions Code may nevertheless be capable of transacting business and carrying out [their] affairs, either during occasional lucid intervals or throughout [their] hospitalization.  (*Hsu, supra*, 259 Cal.App.2d at pp. 572–573; see also *Phillips v. Standard Acc. Ins. Co.* (1960) 180 Cal.App.2d 474, 481 [" 'old age, feebleness, forgetfulness, . . . personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion' " does not equate to lack of legal capacity under § 352].).

Lack of legal capacity to make decisions may also result from the injury at issue in the litigation when the person is "rendered unconscious by his or her injuries" (*Feeley v. Southern Pacific Transportation Co.* (1991) 234 Cal.App.3d 949, 953) or is otherwise able to establish that, as a result of the injuries, the person is unable to care for property, transact business or understand the nature or effects of the person's own acts.  (*Tzolov v. International Jet Leasing, Inc.* (1991) 232 Cal.App.3d 117, 118.)  However, a lengthy hospitalization or a serious medical condition as a result of an injury is not sufficient, in itself, to create lack of legal capacity.  (See *Sanchez v. South Hoover Hosp.* (1976) 18 Cal.3d 93, 102 [the disability described by section 352 does not "include either physical debility or hospital

18

confinement"]; *Baker, supra*, 39 Cal.App.3d at p. 322 [the disability described in section 352 does not include "[m]ere physical disability or nervous shock following an accident"].) For example, our Supreme Court observed in one instance that a plaintiff's hospitalization did not constitute the type of disability described in section 352 because she still had "local relatives who might have assisted her in investigating her claim or in retaining counsel to do so." (*Sanchez,* at p. 103.)

The question before us is whether the SAC pleads " 'specific facts,' " which, if proven, could support a finding that Susan lacked legal capacity to make decisions from the time of the Incident until her death. (*Gentry, supra,* 99 Cal.App.4th at p. 824.) As we have described, the SAC contains certain conclusory allegations about Susan's lack of legal capacity to make decisions. Mirroring the language from the case law we have set forth above, the SAC alleges that Susan "was incapable of caring for her property or transacting business or understanding the nature or effects of her acts both prior to the incident in question and until her untimely death." Similarly, the SAC alleges that, after the Incident, Susan's "capacity to make decisions never reached a degree where caring for her property or transacting business or understanding the nature or effects of her acts would describe her reality."

However, because Robert was required to "plead facts to negative the [statute of limitations] bar" (*Union Carbide, supra*, 36 Cal.3d at p. 25), these conclusory allegations that merely parrot the applicable legal standards are not sufficient. Robert contends that his conclusory allegations should be sufficient because a plaintiff is normally required to plead only " ' "ultimate facts." ' " (See *Morris v. JPMorgan Chase Bank, N.A.* (2022) 78 Cal.App.5th 279, 292 [ordinarily, " ' "[t]o withstand a demurrer, a complaint must allege ultimate facts, not evidentiary facts or conclusions of law" ' "]; *Doe v. City of*

19

*Los Angeles* (2007) 42 Cal.4th 531, 550 [a "complaint ordinarily is sufficient if it alleges ultimate rather than evidentiary facts"].)  This argument fails because, as we have explained, a heightened pleading standard arises when a complaint shows, on its face, that it is barred by the statute of limitations.  In that case, a plaintiff must plead *specific* facts to overcome the limitations bar. (*Gentry, supra*, 99 Cal.App.4th at p. 84.)

We therefore turn to the *specific* facts pled in the SAC to determine whether they would establish, if proven, that Susan lacked legal capacity to make decisions.  As we have explained, the basic question is whether Susan was "sufficiently aware of the nature or effects of [her] acts to be able to comprehend such business transactions as the hiring of an attorney and the instigation of a legal action." (*Hsu, supra*, 259 Cal.App.2d at p. 575.)  The SAC specifically alleges that Susan (1) was being treated for schizophrenia; (2) was involuntarily hospitalized for medical treatment in May 2010, January 2011, and June 2016; (3) was the subject of a conservatorship in 2011; (4) suffered from delusions; and (5) had other difficulties in daily living and social relationships.  With respect to the time period after the Incident, the SAC specifically alleges that Susan was hospitalized, after which she entered hospice care and died.

None of these specific facts are sufficient to establish that Susan lacked legal capacity to make decisions during the time period between the September 2017 Incident and her death on December 2, 2017.  The allegations regarding the conservatorship in 2011 could have been relevant if Robert was able to allege both that the conservatorship was (1) ordered because Susan suffered from the type of mental incapacity needed to trigger section 352, subdivision (a); and (2) still in place at the time of the Incident. However, the SAC contains no such allegations.  Notably, a conservatorship

20

under Michigan law can be ordered on several grounds that do not involve mental incapacity.[11]  Similarly, the last of Susan's involuntary hospitalizations is alleged to have taken place more than a year prior to the Incident, and Robert has not alleged that the involuntarily hospitalization was based on any type of mental incapacity on Susan's part.

Robert argues that the trial court should have considered the Michigan court documents attached to his counsel's declaration in determining whether the SAC sufficiently pled facts that, although not "conclusive," would have helped to establish Susan's lack of legal capacity to make decisions. Specifically, Robert argues that the documents were properly before the trial court because "a court ruling on a demurrer may consider matters subject to judicial notice."  (See *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924 [for purposes of reviewing a demurrer, a court may "consider matters subject to judicial notice"].)  However, this argument fails because Robert did not ask the trial court to take judicial notice of the documents attached to counsel's declaration.  He also has made no such request on appeal.  Although a court may consider judicially noticed documents in ruling on a demurrer (*Blank, supra,* 39 Cal.3d at p. 318), because Robert made no request for judicial notice, the documents attached to counsel's declaration

---

11     As Jacuzzi and FirstStreet point out, the Michigan statute governing the appointment of a conservator for an adult sets forth several grounds unrelated to mental incapacity, such as "physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance," as well as allowing a conservatorship for someone "who is mentally competent, but due to age or physical infirmity is unable to manage his or her property and affairs effectively and who, recognizing this disability, requests a conservator's appointment."  (Mich. Comp. Laws, § 700.5401(3), (4).)

were not properly before the trial court when it ruled on whether the survivor claims in the SAC were barred by the statute of limitations.

In sum, we conclude that the trial court properly rejected each of the three grounds on which Robert attempted to avoid the bar of the statute of limitations. Accordingly, the trial court did not err in sustaining the demurrers to the survivor claims in the SAC on the ground that they are time barred.

4. *The Trial Court Abused Its Discretion in Not Granting Leave to Amend to Allege that Susan Lacked the Legal Capacity to Make Decisions Based on the 2016 Guardianship Order*

We next consider whether the trial court abused its discretion in failing to grant Robert leave to amend to file a third amended complaint.

Although Robert requested that the trial court grant him leave to amend in his opposition to the demurrers to the SAC, Robert's initial appellate briefing did not argue that the trial court abused its discretion in denying leave to amend. As we have noted, however, as long as there is "a reasonable possibility that the defect can be cured by amendment," an appellate court may conclude that the trial court abused its discretion in denying leave to file an amended complaint "even if the plaintiff does not claim on appeal that the trial court abused its discretion in sustaining a demurrer without leave to amend." (*Aubry, supra*, 2 Cal.4th at p. 971.)[12]

---

[12] Jacuzzi contends that the rule we have quoted from *Aubry, supra*, 2 Cal.4th at page 971, does not apply here because *Aubry* "addressed granting leave to allow a plaintiff to add a new *claim*, not additional facts to plead around an affirmative defense appearing on the face of the complaint." We understand the distinction that Jacuzzi attempts to draw based on the specific procedural circumstance presented in *Aubry*, but we do not find it to be persuasive in light of the principle, identified in *Aubry*, that " '[i]n the furtherance of justice *great liberality* should be exercised in permitting a

22

Based on our review of the Michigan court documents submitted by Robert's counsel in opposition to the demurrers to the SAC, along with the court dockets submitted by FirstStreet in support of its demurrer to the FAC, we requested that the parties submit further briefing on whether a reasonable possibility exists that Robert will be able to amend his complaint to avoid the statute of limitations bar for the survivor claims. Specifically, we asked the parties to address whether the trial court abused its discretion in not granting Robert leave to amend his pleadings to rely on the July 25, 2016 Michigan court order appointing a guardian ad litem to allege, with specificity, that Susan lacked legal capacity to make decisions within the meaning of section 352, subdivision (a) from the date of the Incident to her death.

### a.     *The Sham Pleading Doctrine Does Not Apply*

Before we address whether the parties' supplemental briefing shows that there is a reasonable possibility that Robert can amend his complaint to plead, with specificity, that Susan lacked legal capacity within the meaning of section 352, subdivision (a), we must first address whether, as Jacuzzi and FirstStreet contend, Robert is precluded under the sham pleading doctrine from alleging, in any pleading, that Susan lacked legal capacity to make decisions at the time of her death.

Under the sham pleading doctrine, "[w]hen a plaintiff files an amended complaint, it may not 'omit harmful allegations . . . from previous complaints.' [Citations.] Unless the plaintiff provides a 'plausible' explanation for

---

plaintiff to amend his [or her] complaint.' " (*Id.* at pp. 970–971, italics added.) We perceive no reason to refrain from exercising great liberality when the pleading defect concerns a plaintiff's attempt to plead facts showing that the action is not barred by the statute of limitations.

dropping the harmful allegations (such as the need to correct a mistaken allegation or to clarify ambiguous facts), the trial court will take judicial notice of the harmful allegations and disregard the new and contrary allegations." (*Smyth, supra*, 31 Cal.App.5th at p. 195.)

However, the sham pleading doctrine was not " ' " 'intended to prevent honest complainants from correcting erroneous allegations of generic terms which may have legal implications but which are also loosely used by laymen or to prevent the correction of ambiguous statements of fact.' " ' " (*Lim v. The.TV Corp. Internat.* (2002) 99 Cal.App.4th 684, 691.) Further, the doctrine does not apply "where a plaintiff clearly shows that the earlier pleading is the result of mistake or inadvertence." (*JPMorgan Chase Bank, N.A. v. Ward* (2019) 33 Cal.App.5th 678, 690 (*Ward*); see also *Hendy v. Losse* (1991) 54 Cal.3d 723, 743 [" ' "a party should be allowed to correct a pleading by omitting an allegation which, it appears, was made as the result of mistake or inadvertence." ' "].) " 'Instead, it is intended to enable courts " 'to prevent an abuse of process.' " [Citation.]' " (*Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 344.) "Plaintiffs therefore may avoid the effect of the sham pleading doctrine by alleging an explanation for the conflicts between the pleadings." (*Ibid.*)

Jacuzzi and FirstStreet contend that, because of an allegation that appears in both the original complaint and the FAC, the sham pleading doctrine prevents Robert from alleging that Susan lacked the legal capacity to make decisions during the time period between the Incident and her death. Specifically, both the original complaint and the FAC allege that Susan was "a competent adult" at the time of her death. The SAC deleted that allegation and, in its place, alleged that Susan "was an incompetent adult" at the time of her death. According to Jacuzzi and FirstStreet, due to his prior

allegations in the original complaint and the FAC that Susan "was a competent adult," Robert should be precluded from attempting to toll the statute of limitations by pleading in a subsequent complaint that Susan lacked the legal capacity to make decisions within the meaning of section 352, subdivision (a).

To explain why the original complaint and the FAC alleged that Susan was "a competent adult" Robert states that the allegation was merely inadvertent "boilerplate language." Robert points to other *particular* factual allegations in the original complaint and the FAC that are inconsistent with describing Susan as a competent adult at the time of her death. Specifically, both the original complaint and the FAC alleged that the Incident "greatly . . . reduced [Susan's] . . . cognitive abilities . . . and awareness." The FAC also alleged that at the time of the Incident until her death, Susan "was schizophrenic and lacked the legal capacity to make decisions."

In light of the specific allegations in the original complaint and the FAC about Susan's mental state after the Incident, we credit as "plausible" (*Smyth, supra*, 31 Cal.App.5th at p. 195) counsel's explanation that the description of Susan as "a competent adult" in the original complaint and the FAC was an inadvertent boilerplate allegation that was not meant as a specific factual allegation about Susan's legal capacity to make decisions. Moreover, Robert stated *very early* in the litigation, namely, in his opposition to Jacuzzi's demurrer to the *original* complaint, that he was taking the position that Susan "lacked the capacity to make decisions from the date of the [I]ncident until she died, thus tolling the statute of limitations under [section 352, subdivision (a)]." (See *Ward, supra*, 33 Cal.App.5th at p. 692 [concluding that the sham pleading doctrine did not apply where, among

other things, the plaintiff "immediately distanced itself from such allegations in responding to the demurrer"].)

We further reject Jacuzzi's and FirstStreet's reliance on the sham pleading doctrine because that doctrine applies only to previously pled *factual allegations*, not to previously pled *legal conclusions*. (*Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 242 fn. 7 [rejecting application of sham pleading doctrine because "whether Plaintiff was an employee is a legal conclusion, not a fact"]; Edmon & Karnow, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2023) ¶6:248 [the sham pleading doctrine "applies to facts, not legal conclusions to be drawn from the facts (such as whether the parties had an agency relationship or instead that of buyer and seller)"].) The bare allegation that Susan was a "competent adult" is best understood as a legal conclusion, not an allegation of a specific factual circumstance that would justify the application of the sham pleading doctrine. (See *Ward, supra*, 33 Cal.App.5th at p. 691 [describing case law holding that the sham pleading doctrine did not apply when "[t]he allegation of willful misconduct in the earlier complaint was 'but an allegation of a conclusion' on a question that was 'essentially a question of fact' "].)

> b. *Based on the 2016 Guardianship Order There Is a Reasonable Possibility That Robert Can Amend the Complaint to Specifically Allege That Susan Lacked the Legal Capacity to Make Decisions During the Relevant Timeframe*

Having rejected the application of the sham pleading doctrine, we turn to the parties' supplemental briefing to determine whether "there is a reasonable possibility" (*Aubry, supra*, 2 Cal.4th at p. 971) that Robert can overcome the statute of limitations bar by amending the complaint to

26

specifically allege that at the time of the Incident and until her death, Susan was the subject of a guardianship order.

Based on the parties' supplemental briefing, we conclude that Robert should be granted leave to file an amended complaint relying on the July 25, 2016 guardianship order to specifically plead that the statute of limitations was tolled for the survivor claims from the time of the Incident until Susan's death. Under Michigan law, a guardianship order is granted based on a finding that the person subject to the order is an "incapacitated individual." (Mich. Comp. Laws, § 700.5306(1).) Specifically, a court must find "by clear and convincing evidence both that the individual for whom a guardian is sought is an incapacitated individual and that the appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual, with each finding supported separately on the record." (*Ibid.*) The relevant Michigan statute states that the definition of an "[i]ncapacitated individual" for the purpose of a guardianship order is "an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, *to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions*." (Mich. Comp. Laws § 700.1105(a), italics added.) Robert represents in his supplemental briefing that a full guardianship was ordered for Susan in 2016 and that the order stayed in place from the time of the Incident until Susan's death.

The legal standard under Michigan law is, on its face, very similar to the standard set forth in section 352, subdivision (a) for a person who lacks the legal capacity to make decisions. Specifically, the subject of a guardianship under Michigan law must be found to be "lacking sufficient understanding or capacity to make or communicate informed decisions."

27

(Mich. Comp. Laws § 700.1105(a).) Similarly, a person qualifies as lacking the legal capacity to make decisions under section 325, subdivision (a) if the person is not "sufficiently aware of the nature or effects of [the person's own] acts to be able to comprehend such business transactions as the hiring of an attorney and the instigation of a legal action" (*Hsu, supra*, 259 Cal.App.2d at p. 575), or, as defined by another authority, is " 'incapable of caring for [that person's own] property or transacting business or understanding the nature or effects of [that person's own] acts.' " (*Alcott, supra,* 93 Cal.App.4th at p. 101.) An allegation that Susan was the subject of a guardianship at the time of the Incident until her death would therefore be a *specific* factual allegation that, if proven, would support Robert's contention that, during the relevant timeframe, Susan lacked the legal capacity to make decisions within the meaning of section 352, subdivision (a).

Jacuzzi (joined by First Street) argues in its supplemental briefing that certain Michigan court decisions, mostly unpublished, demonstrate that guardianships have been ordered even when the evidence suggests that the person can understand legally binding transactions or participate in making decisions. The decisions that Jacuzzi identifies are highly fact specific and are not particularly relevant here. However, regardless of whether Jacuzzi's legal authorities apply, we nevertheless understand Jacuzzi to be making the point that a guardianship order by a Michigan court is not *necessarily* dispositive of whether Susan lacked the legal capacity to make decisions. We agree with that basic premise. Although the existence of a Michigan guardianship order would be highly relevant to proving that Susan lacked the legal capacity to make decisions within the meaning of section 352, subdivision (a), the mere existence of such an order is not dispositive in and of itself. It is possible that, in litigating this action, evidence will come to

light to support a finding that, despite the 2016 guardianship order, Susan nevertheless did have the capacity to make decisions within the meaning of section 352, subdivision (a).

However, the question currently before us is not whether Robert will eventually be able to *prove* that Susan lacked the legal capacity to make decisions. The sole issue is whether, if Robert is granted leave to amend, it is *reasonably possible* that he can cure the defects that exist in the SAC. Those defects consist of the SAC's failure to plead *specific facts* to support the allegation that the limitations period for the survivor claims was tolled pursuant to section 352, subdivision (a) based on Susan's lack of legal capacity to make decisions during the relevant timeframe. We are persuaded, based on the parties' supplemental briefing, that if granted leave to amend, it is reasonably possible Robert will, in good faith, be able to plead specific facts that, if proven, could support a finding that Susan lacked the legal capacity to make decisions. Those specific facts would consist of allegations that (1) as the subject of a 2016 guardianship order, Susan was found to be an incapacitated person, who lacked "sufficient understanding or capacity to make or communicate informed decisions" (Mich. Comp. Laws § 700.1105(a)); and (2) the guardianship stayed in place until Susan's death.

Jacuzzi and FirstStreet also argue that because Robert already had multiple opportunities to amend his pleadings, we should conclude that the trial court did not abuse its discretion in denying leave to amend to file a third amended complaint. They focus on the representation by Robert's counsel to the trial court that, if granted leave to amend in response to the demurrers to the FAC, he would rely on a guardianship order to plead that Susan lacked capacity. Robert failed to include that allegation in the SAC.

29

Instead, the SAC identifies only the 2011 conservatorship order and Susan's involuntary hospitalizations.

"Where several successive amended complaints have been vulnerable to demurrer on the same ground, the trial court may reasonably find the complaint is incapable of being amended to state a cause of action, and it is not an abuse of discretion to deny leave to amend." (*Tucker v. CBS Radio Stations, Inc.* (2011) 194 Cal.App.4th 1246, 1256.) Here, however, the trial court was not presented with facts showing that the complaint was incapable of being amended to remedy the current defects. Although Robert, in the SAC, was not completely successful in pleading the factual basis for the allegation that Susan lacked legal capacity, he was properly focused on the Michigan court proceedings. Specifically, the SAC identifies the Michigan conservatorship order and the involuntary hospitalizations, including one in 2016. Further, in his oppositions to the demurrers to the SAC, Robert submitted documentation about the 2016 guardianship order and attempted to focus the trial court on its significance. Moreover, although leave to amend may reasonably be denied when the defendant can show that the delay resulted in prejudice (*Bidari v. Kelk* (2023) 90 Cal.App.5th 1152, 1173), neither Jacuzzi nor FirstStreet have attempted to show that they would suffer any prejudice if Robert were permitted to file a third amended complaint. Under the circumstances, in light of the principle that " 'great liberality should be exercised in permitting a plaintiff to amend his complaint' " when there is a reasonable possibility that the amendment will cure the pleading defects (*Aubry, supra*, 2 Cal.4th at pp. 970–971), we conclude that the trial court abused its discretion in failing to grant Robert leave to amend.

On remand, the trial court should grant Robert leave to file a third amended complaint to specifically allege Susan lacked the legal capacity to make decisions between the time of the Incident and her death, as shown by the fact that (1) a July 25, 2016 guardianship order was issued based on Susan's lack of "sufficient understanding or capacity to make or communicate informed decisions" (Mich. Comp. Laws § 700.1105(a)); and (2) the guardianship order stayed in place until Susan's death.

C.    *The Trial Court Properly Sustained the Demurrers to the Breach of Warranty Causes of Action*

Because we are reversing the judgment of dismissal so that Robert may file a third amended complaint, we next address whether, as Robert contends, the trial court erred in sustaining the demurrers to the breach of warranty causes of action.

1.    *Breach of Express Warranty*

"The law governing express warranties is clear.  A warranty is a contractual promise from the seller that the goods conform to the promise.  If they do not, the buyer is entitled to recover the difference between the value of the goods accepted by the buyer and the value of the goods had they been as warranted.  (Cal. U. Com.Code, §§ 2313, subd. (a) & 2714, subd. (2).)" (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 830.)  A plaintiff may also recover incidental and consequential damages. (Cal. U. Com. Code, § 2715.)  Under the applicable law, "express warranties are created as follows:  '(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.  [¶]  (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.'  Hence, to prevail on a breach of express

31

warranty claim, the plaintiff must prove (1) the seller's statements constitute an ' "affirmation of fact or promise" ' or a ' "description of the goods" '; (2) the statement was ' "part of the basis of the bargain" '; and (3) the warranty was breached." (*Weinstat v. Dentsply Internat., Inc.* (2010) 180 Cal.App.4th 1213, 1227, quoting Cal. U. Com. Code, § 2313, subd. (1).) Under certain circumstances, "statements made by a manufacturer or retailer in an advertising brochure which is disseminated to the consuming public in order to induce sales can create express warranties." (*Keith v. Buchanan* (1985) 173 Cal.App.3d 13, 22.)

"In order to plead a cause of action for breach of express warranty, one must allege the exact terms of the warranty, plaintiff's reasonable reliance thereon, and a breach of that warranty which proximately causes plaintiff injury." (*Williams v. Beechnut Nutrition Corp.* (1986) 185 Cal.App.3d 135, 142 (*Williams*).)

The cause of action for breach of express warranty in the SAC does not meet the applicable pleadings requirements because it does not allege the "exact terms of the warranty." (*Williams, supra*, 185 Cal.App.3d at p. 142.) Instead, the SAC contains the following vague and conclusory allegation: "Defendants, and each of them, expressly warranted that the walk-in Jacuzzi tub was free from defects and was safe for use, especially so for the target audience of Defendants' marketing. Defendants did this by written and/or spoken warranty, promise, description, sampling, and/or modeling of the product's safety for use by consumers such as [Robert] and [Susan]. . . . Defendants, and each of them, breached these express warranties (because the tub was not safe for its target audience), and such breach was the proximate and legal cause of the failure of the walk-in tub."

32

In Robert's opening appellate brief, he contends that the SAC identifies the exact terms of the warranty because, in the "General Allegations" section of the SAC, it alleges that in marketing Jacuzzi's walk-in bathtubs, "[Jacuzzi] and [FirstStreet] falsely claimed" that Jacuzzi's walk-in bathtub "was 'Designed for Seniors.'" However, even when this allegation is considered, the SAC still does not state a claim for breach of express warranty. To plead such a cause of action, the SAC must identify a statement that constitutes an "affirmation of fact or promise" or a "description of the goods." (Cal. U. Com. Code, § 2313, subd. (1).) A statement that the bathtub was " 'Designed for Seniors' " is neither an affirmation of fact or promise, nor a description of the goods. Instead, it is an explanation of the targeted consumer demographic.

In Robert's appellate reply brief, he identifies additional allegations in the SAC that he contends constitute "the exact terms" of the express warranty made by either Jacuzzi or FirstStreet. (*Williams, supra*, 185 Cal.App.3d at p. 142.) Specifically, Robert points to a series of allegations in paragraphs 130, 131 and 135 of the SAC that are set forth under the heading "Punitive Damages." (Underscoring and capitalization omitted.) These paragraphs allege that "Defendants advertised and continue to advertise" that "the solution to having a hazardous experience while taking a bath is the Jacuzzi Walk-in Tub," "those who purchase a walk-in tub can feel safe and feel better with every bath," and "getting out of the tub is easy like getting out of a chair and that it is nothing like climbing up from the bottom of the user's old tub." Robert argues that these statements "constituted an express warranty of the tub's safety." As we will explain, Robert's reliance on these paragraphs of the SAC do not assist him in stating a claim for breach of express warranty.

For one thing, because Robert identified the additional allegations in the SAC for the first time in his appellate reply brief, his argument is not properly before us in this appeal, and we may reject it on that ground. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218 [noting that "[o]bvious reasons of fairness militate against consideration of an issue raised initially in the reply brief"].)  Moreover, for two additional reasons, the paragraphs from the SAC that Robert relies upon in his reply brief are not properly before us in assessing whether the SAC states a claim for breach of express warranty. First, because paragraphs 130, 131 and 135 are part of the allegations supporting the request for punitive damages, the trial court granted the motion to strike them from the SAC.  They are accordingly no longer part of the SAC for the purpose of stating a claim for breach of express warranty. Second, even if paragraphs 130, 131 and 135 were still part of the SAC, they are not incorporated into the cause of action for breach of express warranty.[13]

Further, even were we to consider the allegations identified by Robert in his reply brief, they fail to adequately plead a cause of action for breach of express warranty because (1) they do not identify which defendant is alleged to have made the statements; and (2) at most, the statements are vague assertions about the generally enhanced level of safety that users of the walk-in bathtub can expect to experience, as compared to a standard bathtub, but

---

[13] The cause of action for breach of express warranty in the SAC states, in paragraph 102, that it "re-alleges and incorporates by reference each and every allegation made *above* in this Complaint as though fully set forth herein." (Italics added.)  However, paragraphs 130, 131 and 135 appear *after* paragraph 102.

they do not set forth any *specific* affirmation of fact or promise, nor do they constitute a description of the goods.  (Cal. U. Com. Code, § 2313, subd. (1).)

We accordingly conclude that the trial court properly sustained the demurrer to the breach of express warranty cause of action.  Further, because Robert has not met his burden to identify how he would amend to state a cause of action for breach of express warranty, the trial court did not abuse its discretion in denying leave to amend.

2.      *Breach of the Implied Warranty of Fitness for a Particular Purpose and Breach of the Implied Warranty of Merchantability*

We next consider, together, the causes of action for breach of the implied warranty of fitness for a particular purpose and breach of the implied warranty of merchantability.

As applicable here, the dispositive legal principle is that "[p]rivity of contract is a prerequisite in California for recovery on a theory of breach of implied warranties of fitness and merchantability."  (*All West Electronics, Inc. v. M-B-W, Inc.* (1998) 64 Cal.App.4th 717, 725.)  The specific type of privity required is "vertical privity," which "means that the buyer and seller were parties to the sales contract."  (*Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 138–139.)  " 'The term 'vertical privity' refers to links in the chain of distribution of goods.  If the buyer and seller occupy adjoining links in the chain, they are in vertical privity with each other . . . .' "  (*Osborne v. Subaru of America, Inc.* (1988) 198 Cal.App.3d 646, 656 fn. 6.)  A failure to plead privity is a proper ground for demurrer for

35

failure to state a claim. (*Anthony v. Kelsey-Hayes Co.* (1972) 25 Cal.App.3d 442, 448.)[14]

We turn to the SAC to determine whether it alleges the required privity between Robert or Susan, on the one hand, and either Jacuzzi or FirstStreet, on the other. The SAC vaguely alleges, identically as to both Jacuzzi and FirstStreet, that they were "the manufacturer, supplier and/or installer of the Jacuzzi walk-in tub" used by Susan. The SAC also alleges that Atlas Home Improvement LLC was "a general contractor, supplier and/or installer of the Jacuzzi walk-in tub" used by Susan. However, the SAC does not allege that Jacuzzi or FirstStreet had any direct contractual relationship with Robert or Susan. The SAC alleges that "[i]n or about December 2016, [Robert] entered into a contract for the purchase and installation of a Jacuzzi walk-in tub," but it does not specify that the contract involved either Jacuzzi or FirstStreet.

After two rounds of demurrers to the breach of implied warranty causes of action by FirstStreet on the ground that Robert did not plead the required privity, Robert was not able, in the SAC, to amend his pleadings to allege that he or Susan were in privity with Jacuzzi or FirstStreet. Indeed, the only representation Robert has made during this litigation about a relevant

---

14     As Robert points out in his reply brief, case law explains that there are "multiple court-created exceptions to the general rule of privity," including "in cases involving foodstuffs, drugs and pesticides, substances marketed with the knowledge the purchaser may not be the ultimate consumer of the product," and "when an inherently dangerous instrumentality causes harm to a buyer's employee." (*Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1201.) None of those exceptions are relevant here. Further, Robert cites *Ramos v. Brenntag Specialties, Inc.* (2016) 63 Cal.4th 500, 503, to support his statement that "suppliers are liable for breach of implied warranty." *Ramos*, which concerns the component parts doctrine applicable to product liability claims, does not touch on the requirement of privity for a cause of action alleging a breach of an implied warranty.

36

contractual relationship appears in Robert's opening appellate brief, where he states that "[i]t was Atlas Home improvement . . . that contracted with Robert to install the tub."

Because Robert has not alleged any privity with either Jacuzzi or FirstStreet, and he has not shown that he could amend his pleadings do so, the trial court properly sustained, without leave to amend, the demurrer to the cause of action for breach of the implied warranty of fitness for particular purpose and the cause of action for breach of the implied warranty of merchantability.

D.    *The Trial Court Did Not Abuse Its Discretion in Ruling on the Motions to Strike*

Because we are reversing the judgment of dismissal and remanding with leave to amend, the final issue we must consider is whether, as Robert contends, the trial court erred in ruling on Jacuzzi's motion to strike certain allegations from the SAC.

As we have described, both Jacuzzi and FirstStreet filed motions to strike certain allegations from the SAC. Both parties sought an order striking the punitive damages allegations. Jacuzzi also sought an order striking certain allegations added in the SAC that went beyond the scope of the trial court's leave to amend. The trial court granted the motion to strike the allegations relating to punitive damages. It also granted, in part, Jacuzzi's motion to strike some of the other paragraphs in the SAC.

Robert does not dispute that, without viable survivors claims in the SAC, the allegations relating to punitive damages were properly stricken because the remaining wrongful death claims cannot support a prayer for punitive damages. (*Boeken, supra,* 48 Cal.4th at p. 796 ["Punitive damages are not available . . . in a statutory wrongful death action."].)  On remand, if Robert files a third amended complaint that realleges the survivor claims, he

37

may also, again, attempt to state a claim for punitive damages with respect to the survivor claims.[15]

Here we are concerned with the trial court's order striking the allegations that, according to Jacuzzi, exceeded the scope of the trial court's leave to amend. Specifically, in ruling on Jacuzzi's demurrer to the FAC, the trial court stated that Robert's leave to amend would be limited to adding allegations concerning Susan's lack of legal capacity to make decisions. In ruling on FirstStreet's demurrer to the FAC, the trial court stated that Robert's leave to amend would be limited to adding allegations regarding punitive damages and the breach of warranty causes of action.

The trial court did not strike from the SAC all the paragraphs identified in Jacuzzi's motion to strike as exceeding the scope of leave to amend, but it did strike paragraphs 29, 30, 37 through 39, 75, 77 and 84. Robert contends the trial court erred in striking those specific paragraphs.

"It is the rule that when a trial court sustains a demurrer with leave to amend, the scope of the grant of leave is ordinarily a limited one. It gives the pleader an opportunity to cure the defects in the particular causes of action to which the demurrer was sustained, but that is all." (*Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1329.) Moreover, when a trial court sustains a demurrer with leave to amend, a plaintiff may amend its "complaint only as authorized

---

[15] Although the parties discuss, on appeal, whether the punitive damages allegations should have been stricken from the SAC for the additional reason that the SAC did not allege sufficient facts to support a claim for punitive damages, we need not, and do not, reach that issue. We affirm the order striking the punitive damages allegations from the SAC solely on the ground that the remaining wrongful death claims in the SAC cannot support a claim for punitive damages. (*Boeken, supra,* 48 Cal.4th at p. 796.)

by the [trial] court's order." (*Harris v. Wachovia Mortgage, FSB* (2010) 185 Cal.App.4th 1018, 1023.) We apply an abuse of discretion standard of review in an appeal from a trial court's order striking parts of a pleading that are not in conformity with the scope of the leave to amend granted after an order sustaining a demurrer. (*Leyte-Vidal v. Semel* (2013) 220 Cal.App.4th 1001, 1015; see also § 436, subd. (b) [giving the trial court the discretion to "[s]trike out all or any part of any pleading not drawn or filed in conformity with . . . an order of the court"].)

We turn to the specific allegations in paragraphs 29, 30, 37 through 39, 75, 77 and 84 of the SAC to determine if the trial court abused its discretion in determining that those paragraphs were improperly added to the SAC. Our specific inquiry is whether the trial court could reasonably conclude that those paragraphs do not concern the issues on which it permitted leave to amend, namely, (1) the breach of warranty allegations, (2) the claim for punitive damages, or (3) Susan's alleged lack of legal capacity to make decisions.

Based on our review of the SAC, none of the paragraphs at issue concern any of the issues within the scope of the trial court's leave to amend. Specifically, paragraphs 29 and 30 expressly concern the alleged applicability of the discovery rule and the doctrine of fraudulent concealment. Paragraphs 37 through 39, 75 and 77, which fall under the heading of "General Allegations," (1) allege certain defects of the bathtub, (2) allege "Defendants" knew of the defects and failed to warn of them, and (3) allege Susan's injuries were caused by the defects. (Capitalization omitted.) Paragraph 84 appears in the cause of action for strict product liability and alleges certain elements specific to that cause of action. Based on the subject matter of paragraphs

29, 30, 37 through 39, 75, 77 and 84, the trial court was within its discretion to strike them from the SAC.

## DISPOSITION

The judgment of dismissal of Robert's survivor claims is reversed. This matter is remanded to the trial court with directions to grant Robert leave to file a third amended complaint to specifically allege that, as evidenced by a 2016 guardianship ordered by a Michigan court, Susan lacked the legal capacity to make decisions from September 2017 until her death. The parties shall bear their own costs on appeal.


IRION, Acting P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.